Good morning, Your Honor. Michael Brodsky representing Gonzalo Arellano, and I would like to reserve three minutes for rebuttal, if I may. Your Honors, this is a case of a due process violation at an asylum hearing. Instead of allowing full examination of the asylum applicant, as this Court requires at every asylum hearing, the immigration judge instead limited the hearing to argument between counsel about what was stated on the applicant's asylum application. The immigration judge said that he doubted Mr. Arellano's claims of persecution as a gay man because Mr. Arellano had errantly checked the married box on the application. And the immigration judge said that he doubted Mr. Arellano's claims of persecution   Mr. Arellano did answer the question that asks if the application is filed more than one year after his entry. He answered yes to that. And then where it asks for an explanation, he provided a minimal explanation on the form. That is located at AR 124, question 5. It asks if you're filing more than one year after entering the U.S. He checks yes, and then it asks for an explanation, and he says, in the first year, my sexual orientation was not an issue. Now, at that point, due process and the Code of Federal Regulations required without any question that the immigration judge put him on the stand and ask him, what do you mean by this? And he would have answered, I can tell you. So what page was this again? That's AR 124. Well, it certainly doesn't seem to qualify for extraordinary circumstances. But what I note, though, is then you oppose a remand. The government wants to remand this, right? They want to remand simply to the BIA for an explanation. We want to remand to an immigration judge to give him a full and fair hearing, which he was entitled to. The BIA is not equipped to do fact-finding. They're not equipped to ask him, put him on the stand and ask him, what do you mean? What are your changed circumstances? His changed circumstances were he came out of the closet, Your Honor. And this Court has held that those kind of changes, specifically you've held in a religious context, where someone has to say they come from Country X, they're in the United States for a number of years. Country X is known to persecute, let's say, for example, Catholics. He has a conversion to Catholicism after he's here, so he cannot go back openly to his country. Conversion is quite different. People don't convert sexual orientation. He doesn't say that he discovered. I'm not sure. Conversion is, you know, you now have joined a religion that is persecuting. That is a very interesting discussion and question. What case are you relying on? I'm not. Without doubt, Your Honor, he has a right to have this decided by an immigration judge in the first instance. This is not something this Court can pass on here. We haven't had the opportunity to present evidence, to present experts, to present our case, and the Supreme Court has held in Ventura. Did he proffer any? He wasn't allowed to. The I.J. wouldn't let him take the stand. His counsel asked, please let me put my client on the stand and explain. And the I.J. said, no, I'm not going to do it. He had a right to present testimony. This Court has held repeatedly. But he wasn't asking to present testimony about why he was beyond. You really never addressed timeliness. You know, this is the first time we've really much ever talked about it. I mean, my understanding is that it was the incompleteness of the application that was really what he wanted to get on the stand about, not. He said he wanted to get into the merits and explain. There were a number of issues. They tried him in absentia, Your Honor. The government counsel and the I.J. said, well, you say you're gay, but you've checked this box. In absentia means he wasn't there. Was he there? Exactly. So this is what happened. The I.J. says, you've checked the married box, yet you're claiming persecution as a gay man. I don't believe you. The government jumps up and says, he's been married three times, Your Honor. But wait. Was your client there? He's sitting there and his counsel says, please. All right. Well, it wasn't in absentia then. That's a legal term. That's a legal term. It would have. No, that's a legal term. I'm using hyperbole, Your Honor, but it would have made. No, let's not. Let's not. Let's dial it back and let's deal with what happened. Okay. He had a right to take the stand. Once that was put in issue and the I.J. was questioning the merits of his application, he had a right to take the stand to answer the question. All he had to do was put him on the stand, ask him, you say here you're gay, but you've checked the married box. What's your explanation? And then after the explanation, just say, you know, I've looked you in the eye. I've listened to you. I don't believe you. Application denied. That's all he had to do. Well, let's look at it from the standpoint, if we don't see it as a due process issue, we have to look at whether the I.J. abused his discretion in rejecting his application when Ariano knew his application was incomplete when he submitted it. He said he would supplement it, and he had 5 months to file a completed application but didn't do so. So how do we find that it was an abuse of discretion? Well, we can look to BRAVA v. INS at 205 F. 3rd, 1177, in which this Court has said, quote, at a minimum, we find that the regulations require that an applicant for asylum and withholding of removal take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct. So if there's a question about whether there's enough here to do it, you've got to put him on the stand. That's what this Court over and over. Let me just focus in on the ---- I did want to ---- Can I reserve her for rebuttal? Well, if you want, you can. I have a question if you want. Okay. Please, please let me ---- If you don't want to answer ---- No, I think it's wiser to answer your question. Sorry, Your Honor. Let me just focus on the one-year bar and the question of the one-year bar. The ---- you've been talking about having him testify, you know, I was gay, I was, you know, the substance of her application. But did counsel make any proffer as to what he would say regarding this issue, the one-year bar? He's ---- That he would say anything about it? Yeah. Well, he's not in as much detail as I would have liked, but he did say in his motion that Ariana revealed to him only a few days before the hearing that he was gay and that that was the basis, that was the basis that that had just been recently come out and that was the basis for his request for asylum because he had been persecuted as a gay man. The application does not have to put forth all the evidence. That's the ---- No, no, I understand that. But we're talking about proffer. You're right. And proffer is usually made by a lawyer who can't testify, obviously, and he says, you know, if allowed to put on evidence, we will present evidence to this effect. And I'm not sure whether that's necessary in this case, but I'm just wondering, was that done? Did the lawyer say, look, please let my client testify because he will speak to the question of the one-year bar? Not in so many words, but he will explain why he didn't file or what are the circumstances that excuse his failure to file within a year. The record doesn't reflect that he said that specifically. He did say that I want to put my client on the stand and I want to get into the merits and will explain. And the application does answer yes. It's after one year and it gives a reason. Okay. You know, I think that answers my question. Thank you very much. I don't want to take up the rest of your time. We'll give you a minute for a bottle, maybe a little more. Thank you, Your Honor. Okay. We'll hear from the government. Good morning. May it please the Court. My name is Jacob Asheroff and I'm here on behalf of the United States. The remand is warranted in this case in light of this Court's decision in Castellon and the Board's decision in matter of interior on Narosa, which interpreted the regulation in Section 1003.31c, dealing with docket management by immigration judges. In this case, the immigration judge predominated the application because it was substantially incomplete. Now, in terms of that 8 CFR Section 1208.3c, can that really serve as a basis for the BIA's decision? Because the government never returned his application within the 30 days. So that can't really serve as a basis, can it? Well, Your Honor, this section applies to affirmatively filed as applications before DHS. And this section has to be read in tandem with another regulation. Section 1208.9, which specifically deals with procedures before asylum officers. And the regulation specifically says that the service, it doesn't say immigration court. Then another point I would like to make is that then the case was specifically continued to supplement the incomplete application. Well, like for five months, right? That's correct, Your Honor. And why would then the judge return the application if it is known that it is incomplete? Well, let me ask you this. Why do you want to remand it? Well, Your Honor, we would like to remand it. I'm trying to understand that if they can't even show timeliness why they're opposing a remand at this point. But why do you want to remand it? Because they're opposing you on that point, right? Yes, Your Honor. The reason we would like to remand is that for the Board to address ---- May I continue, Your Honor? Please. The reason we would like to remand is for the Board to address matter of Interiana Rose Cazares-Castellon. When the Board issued its decision in January of 2008, the decisions that came out in 2010 obviously were not there. And the Board could not really rely on those decisions in interpreting the facts as well as applying the regulation. When the Board issued ---- it is the government's position when the Board issued that decision, it was not contrary to any established Ninth Circuit or Board precedent. So now we have these two decisions, and we have the Board's decision that does not really address this precedent decision. So we believe that it is fair for this case to go back and for the Board in the first instance to take a look and say whether the IG appropriately pre-demanded the application in the first instance. How would have the government been prejudiced by, at the time, Arellano to supplement his application at the hearing? Couldn't the government have asked for a continuance? Well, Your Honor, in this case, it was Petitioner's obligation to proffer evidence. He was offered ---- if I can dial back and go back to the May the 24th hearing, what happened is that he was ---- he had an opportunity to ask for more time. He chose not to do that because apparently there was an issue with asylum clock. And he wanted ---- With a what? Asylum clock. Asylum clock dealing with the issue, I believe, it's related to work authorization. So now we have Petitioner asking for and given five months to prepare his application. And he failed to submit any evidence whatsoever. And he himself admitted on appeal before the board that his application was substantially incomplete. Even before this circuit, when people fail to file pleadings in time, this Court can dismiss cases for lack of prosecution. We're talking about docket management, and it is within the prerogative of any judicial body to say, well, we're not going to accept the application, or the application isn't complete, or we're not going to proceed with the case because you failed to comply with the deadline. And that's what the issue is here. So we believe that ---- Do you think ---- let me just ask you in terms of if you're asking for a remand, if, and I'm only speaking hypothetically at this point, would the Court be wrong to deny the petition in its present status? Well, we believe a better way. The answer to this question is a better way to proceed is to remand. Even though the Court might believe that the board was correct, the case still has to go back for the board to address the precedent. And if there are any flaws in its reasoning that were not implicated because of the court and board precedent, it would be better for the board in the first instance to address it so that the court would not be substituting its own reasoning for what the board would do otherwise. And I think that that's established principle in Channery and Gonzales v. Tomas and Ventura. What about Petitioner's argument that this ought to be sent back to the I.J. so he has a chance to speak to the, both to the, I gather what he's saying, is speak both to the one-year bar and substance of the application, given a chance to speak to it? Well, the board first has to address the issues whether the I.J. abused the discretion and predominated the application in the first instance. There is another issue, and I think I noted in the government's answering brief. Petitioner in the docket reflects, in that circuit docket, reflects that he's not in the United States. So another issue that we have is that, first, we don't know whether he obtained advance parole prior to living in the United States. The second issue is whether he abandoned his application by living. There's a regulation on .8 CFR 1208.8, which specifically deals with abandonment. So before we even get to immigration court, the board has to rule whether the I.J. abused the discretion, predominated, and has an application, plus address the court precedent and the board precedent. And then the board has to address the issue as to, well, Petitioner's not here. So what do we do? So that's another issue, I think, that perhaps is another issue implicated in this case and something that the board has to take a look at and decide in the first instance. So I guess are you saying that I'm understanding Petitioner's counsel to say, well, let's go back to the immigration judge, but you're saying that the Petitioner's not even here? So, you know, he's saying let's go back so the Petitioner can give his testimony, but the Petitioner's not here? Well, that's what the docket, the non-circuit docket reflects. He's in Vancouver, Canada. And so he's, I mean, he's not in the United States if he's in Vancouver. And so we, at this particular point, I guess we're in a situation where we're not sure still whether the application was abandoned when Petitioner left the United States. So that's another issue, I guess, for the board to decide. Do you know when he left the United States? Your Honor, I cannot. I don't know that. I don't have that information. He was there for the hearing. He was in the United States at the time of the hearing before the I.J. That's correct, Your Honor. He was in the United States. And then I believe he was in the United States when the ---- How do we know he's in Vancouver now? Well, the docket, the Patriot docket says that he's in Vancouver. And the non-circuit Patriot docket says that his address is in, he lives in Vancouver, Canada, British Columbia. Oh, Vancouver. I thought you said Vancouver. No, he's in Canada. That's correct, Your Honor. He just shows the Canadian address for him. That's correct, Your Honor. That's the only information we have. That's all the information we have. We don't ---- And so it's another, I guess, wrinkle in the case that the board has to take a look at. Because, as I know, as I indicated earlier, there are two regulations implicated, one, advanced parole. The second is whether he abandoned the application when he allegedly, we don't know, but his address reflects that he lives in Canada. So we need to take a look at that as well. Okay. Thank you. Thank you. If the Court doesn't have any questions, I would like to submit an oral argument and the government's answering brief. Thank you. Thank you. We'll give you a minute. A couple of points. As far as ---- Is he a client in the United States now? I'm sorry? Is your client ---- I'm not sure where he is at the moment, Your Honor. In terms of any question, if they want to raise that he's violated some regulation by making a trip to Canada, there are no facts ---- Except you're asking to go back to the IJ so that your client can testify. That's right. And if he's not here, how's that ---- It's not unusual at all for after a decision by the BIA for applicants to be paroled back into the country to appear at their hearing. And as he conceded in his brief, there are no facts in the record to support this. The BIA is not a fact-finding body. It doesn't have a fact-finding capacity. If he wants to raise the argument that some violation was regulated and violated and introduced evidence, they're free to do that in front of the IJ. How does his Canadian address appear on our docket? Who put it there? He did, Your Honor, as a mailing address. Well, how can you do that if he's represented by counsel? I believe that was before I was appointed. I see. Yeah. And you have not been in communication with him since then? I have been in communication with him by e-mail, but I'm not ---- I can't say for sure where he is at the moment. But, again, Your Honor, it's not ---- I mean, this Court is not a fact-finding body. There's no evidence in the record. But is it a live case if he's not in the United States? It certainly is a live case, and I represent that he will appear at his hearing if we get a remand to an IJ. How can you do that? Because there is a procedure for, if he is still out of the country, that if he's granted a hearing, they're required to parole him back in for the hearing. And that's not at all unusual that that happens. I consulted with the Immigration Center, and they've got a whole handout on how to do that if it's necessary. So it's a fairly common occurrence. But does he have a live asylum application in this country if he's not physically present in this country? How can he have a live controversy as to asylum when he's not on U.S. territory? Well, I don't know that he isn't at the moment, but assuming arguendo that he wouldn't be, there are any number of cases where asylum applications are denied. Petitioners are given either voluntary removal or deported. They're sent out of the country. Then a number of years goes by, and this Court reverses. Then the procedure is they're paroled back into the country, and they're given a hearing. There are hundreds of cases where that happens. Well, it's stated they're deported, but if they voluntarily leave, how can they have a live controversy here if they are wanting to come here and be here and say, look, I want asylum from this country? But once they leave on their own, how can they have a live controversy? How do we have a live controversy before us for Article III purposes? Well, I can cite Martinez v. Ashcroft, 365 F. 3rd 800, where the government argued the same regulation he cited today, and this Court held that it was a violation of the alien's due process rights to deny the application simply because they had made a trip out of the country well after the decision. So there's precedent. No, no, I understand. I understand that leaving and coming back might or might not raise an issue, but if he's not physically present in this country, if he has left, how can he have a live asylum application? Well, the question is does he have a well-founded fear of persecution? He might have a well-founded fear of persecution, but, you know, for example, Germany wouldn't have any. He couldn't raise an asylum claim in Germany because he's not in Germany. He can't raise an asylum claim in Mexico because he's not in Mexico. Well, he hasn't. How can he raise an asylum claim in this country? How does he have a live asylum claim when he's not in a United States territory or a United States, either a United States or an embassy? Well, because the case law of the circuit allows it, Your Honor. If the asylum claim is denied and then he subsequently leaves the country, he pursues all his recourse at the agency. He goes before the IJ, and then he appeals to the BIA, and everybody there says no. And then subsequent to that, he's out of the country for some reason for some period of time, and then this Court reverses. The procedure is that he's paroled back in. I mean, I can give you a – I didn't know that this would be the, you know, the meat of our discussion here, but I can certainly give you supplemental citations on that to demonstrate that that's a routine procedure. It's slightly different from what I asked as to whether we have a live controversy, but yes, I think supplemental citations on that would be useful. Very good, Your Honor. Well, he's not subject to persecution in the country that he's in. We don't know that he has any ability to remain there or that he's even still there. I mean, I guess I need to find all this out. But there's a different doctrine called the firm resettlement bar that if you've actually obtained, you know, permanent status in some other country and you're safe from persecution. But that's not what the issue the government's raising, and there's no evidence at all that that's the case. The resettlement bar happens if you have another country you go to before the United States. Correct. And let's say you go to Germany, get resettled there, and then come to the United States. You say, well, you were firmly resettled in Germany. There's no reason for you. You're no longer a refugee from wherever you came from. Let's say you came from Somalia or something. Right. But this is not. This is a different situation. This is a situation where you're here, you file an asylum application. You're no longer here. You're no longer in our territory. And I don't see how we have a live controversy. But why don't you give us some supplemental authorities for that? We'll take a look. I'd be glad to, Your Honor. Okay. Anything further? Yes. Just in terms of the argument that he was ordered to supplement the application and failed to do it, I mean, what the record reflects here is that he submitted the application, and then the transcript reflects Mr. Canut, that's his attorney, that says, yes, Your Honor, but we'll supplement it. And then the judge says, okay, so I'm going to mark that then as Exhibit 4. And then the judge adds, and you can, of course, supplement it as you please. So there was no order to supplement. He could have. And I'd also like to say that the application as filed, it was enough. It said, look, I'm from Chile. I'm gay. I was persecuted there as a child. Gays are persecuted there by police. I've been threatened. This is who I've been threatened by. I'm afraid to go back there. But he knew all of that for the duration of his stay in the United States, so this is not something that he discovered. So that implicates a 1-year bar, right? Right. But, again, the 1-year bar is something that the I.J. was required by due process to put him on the stand and let him explain. I mean, there's a principle of integrity of the process here that the regulations in the cases of this Court say when the 1-year bar is implicated and at any asylum hearing, he's got a right to just give him a chance to convince the I.J. And then if he's heard him, you know, the rudiments of due process are noticed in the hearing. He had a right to testify. After hearing his testimony, if the I.J. didn't believe him, he could say, hey, denied, I don't believe you. But he had an obligation to let him take the stand. Okay. Thank you. Thank you, Your Honor. The case is now able to stand submitted.
judges: Korman, Kozinski, Callahan